Syllabus.

# Richmond.

WHITLOCK AND OTHERS v. HAWKINS, COMMISSIONER; O'FLAR-
HERTY, TRUSTEE, &c., v. COMMONWEALTH; CANNON AND
OTHERS v. HAWKINS, COMMISSIONER.

April 21, 1906.

1. CONSTITUTIONAL LAW—*Act Embracing More Than One Object—As-
sessment of Lands—Validating Prior Assessments.*—If an act of the
General Assembly embraces two objects, it contravenes sec. 52 of
the Constitution, and the whole act must be declared void; but if
the subjects embraced are congruous, and have natural connection
with and are germane to one object, the provision of the Constitu-
tion is not violated, and the act is valid. An act which, both in its
title and body, provides for the amendment of a chapter of the
Code in relation to the assessment of lands, and also validates as-
sessments made under that chapter, is not invalid as contrary to
sec. 52 of the Constitution, which declares that an act shall have
but one object, which shall be expressed in its title.

2. CONSTITUTIONAL LAW—*State Constitution—Acts of Assembly Pre-
sumed to be Constitutional.*—As to matters not ceded to the Federal
Government, the legislative powers of the General Assembly are
without limit except so far as restrictions are imposed by the Con-
stitution of the State in express terms or by strong implication.
The State Constitution is a restraining instrument only, and every
presumption is made in favor of the constitutionality of a State
statute. No stronger presumption is known to the law. In order
to warrant the courts to declare a State statute unconstitutional,
the infraction must be clear and palpable.

3. CONSTITUTIONAL LAW—*Retrospective Laws—Curative Acts.*—Retro-
spective laws are not favored, and a statute is always to be con-
strued as operating prospectively, unless a contrary intent is mani-
fest; but the Legislature may, in its discretion, pass retrospective
or curative laws, provided they do not partake of the nature of
what are technically called *ex post facto* laws, and do not impair

the obligation of contracts, or disturb vested rights: and, provided further, they are of such nature as the Legislature might have passed in the first instance to act prospectively.

4. CIRCUIT COURTS—*Jurisdiction—Appointment of Land Assessors.*—Under the act approved December 10, 1903 (Acts 1902-'03-'04, ch. 401, p. 626), the Circuit Courts and the judges thereof were vested with the jurisdiction to appoint assessors of land, which jurisdiction had theretofore been vested in and exercised by the County Courts and judges. This act is not in conflict with sec. 52 of the Constitution.

5. CONSTITUTIONAL LAW—*Curative Acts—Assessments of Lands—Case at Bar.*—A statute regulating the appointment of land assessors and prescribing their powers and duties was amended and re-enacted by a subsequent statute covering the whole subject. Assessors were appointed and acted under the amended act and assessed all the lands of the Commonwealth, and it was then discovered that the amendatory act was not passed by the requisite vote of the Legislature, and hence was a nullity. The Legislature then by a valid statute re-enacted the amendatory statute and validated all acts done under it.

*Held:* The last act is a valid exercise of legislative power not only in so far as the act is prospective in its operation, but also in its curative effect: provided, it does not operate to take the property of the tax-payer without due process of law.

6. CONSTITUTIONAL LAW—*Taxation is "Taking"—Due Process.*—The assessment of lands and imposition of taxes is a taking within the meaning of the Constitution of the United States, and the law under which property is assessed must provide an opportunity for the owner to be heard and contest the justice of the assessment, otherwise he is deprived of his property without due process of law, and the law is unconstitutional and void.

7. CONSTITUTIONAL LAW—*Curative Acts—Construction—Assessment of Lands—Case at Bar.*—Where a provision of a curative act amending a former law with reference to the assessment of land for taxes, if construed retrospectively, would deprive a citizen of the opportunity to be heard as to the correctness and justice of an assessment made under the original act, which opportunity was afforded by the original act, such provision will, if possible, be construed prospectively only, and the remedy given under the original act as to acts done prior to the passage of the curative act will be preserved. The same rule is prescribed by sec. 6 of the Code. Where a statute can be construed as in harmony with the fundamental law, the courts will adopt that construction rather than one which involves an absurdity and renders the law void.

8. STATUTES—*Amendments—Invalidity of Amendment—Effect.*—Where an amendatory statute is unconstitutional and void, the act amended remains in force as before the attempted amendment.

9. TAXATION—*Assessing Lands—Returns of Assessor—Validity of Assessment.*—The failure of an assessor of lands to return his assessments until after the time fixed by law for their delivery does not invalidate the assessments. The assessments should be returned in time to give every person affected thereby opportunity to make objection and obtain redress, but when this has been done every necessary condition has been satisfied, and the provision is directory and not mandatory in its operation. Time is not of the essence of the transaction, and is not a condition of its validity when not required by the statute.

The case of *Whitlock* v. *Hawkins, Com'r,* is an appeal from a decree of the Law and Equity Court of the city of Richmond,. refusing an injunction against the defendant to prevent him from extending taxes based on the recent assessment mentioned in the opinion below. The case of *O'Flaherty* v. *Commonwealth* is a writ of error to a judgment of the Hustings Court of the city of Richmond, refusing to correct an alleged erroneous assessment. The case of *Cannon* v. *Hawkins, Commissioner,* is an original application to this court for a *mandamus* to compel the defendant to extend taxes on the basis of the assessment of 1900, instead of the recent assessment aforesaid.

*Affirmed in first two cases and mandamus denied in third case..*

The opinion states the case.

*O'Flaherty & Fulton* and *Cannon & Gordon,* for tax payers.

*Attorney-General Wm. A. Anderson,* for the Commonwealth..

*H. R. Pollard,* for the city of Richmond.

KEITH, P., delivered the opinion of the court.

These cases were heard together, and involve substantially the same questions of law and fact.

On the 10th of December, 1903, the General Assembly of Virginia passed an act to amend and re-enact chapter 23 of the Code, in relation to the assessment of lands and lots. It was approved by the Governor and published by authority of law among the general acts of that session. By section 437 of that act, the circuit and corporation courts were authorized and required to appoint, on or before the 1st of January, 1905, and every five years thereafter, proper persons to assess the value of all lands and lots, with the improvements thereon, within their respective counties and corporations.

This was done. The assessors were appointed, gave the bonds and took the oaths prescribed by law, and entered upon the discharge of their duties.

The act was passed in pursuance of a constitutional mandate, providing that the lands of the Commonwealth should be assessed at the time and in the manner prescribed by this act, and by section 444 ample provision was made for any person believing himself aggrieved to come before the circuit or corporation court, as the case might be, of the county or corporation in which the land lies, at any time prior to the 1st day of February of the year next succeeding such assessment. The attorney for the Commonwealth was required to defend such applications, and the court was authorized, if satisfied that the assessment was too high, to reduce the same to what in its opinion was the true value of the property assessed; and if of opinion that the assesssment was too low, to increase it in like manner; and it was provided further that such applications should have precedence over all other causes pending in said courts.

The act, therefore, had every outward semblance of authen-

ticity.  It was passed in pursuance of the powers and duties vested in the Legislature by the Constitution, and it met every requisite of a valid and constitutional law; and recognizing that the imposition of taxes and levies is a taking, within the meaning of the Constitution of the United States, ample provision was made and opportunity afforded the owner to be heard and to contest the justice of the assessment, so that on the face of the statute no man could be deprived of his property without due process of law.

Coming before the courts, under section 444 of the act of December 10, 1903, to have erroneous assessments corrected, it was discovered that the act carried with it an appropriation of money out of the public treasury, and that it had not received in the Senate the vote of a majority of all the members elected to that house, as the Constitution of the State requires; and it is conceded that not having received the necessary number of votes, the act failed of its passage, and is null and void.

To meet this situation, the Legislature, on the 17th of March, 1906, passed an act, the title of which is "An act to amend and re-enact chapter 23 of the Code of Virginia, in relation to the assessments of lands and lots, as the same was amended and re-enacted by chapter 388 of the Acts of Assembly, 1902-'3-'4, approved December 10, 1903, and to validate assessments and other acts done under the aforesaid act of Assembly."    Then follows the act, which re-enacts in terms the act as passed on December 10, 1903, and further provides, that "all assessments and all other acts of every kind which have been made or done in compliance with the terms of chapter 388 of the Acts of Assembly, 1902-'3-'4, approved December 10, 1903, are hereby confirmed and declared to be as valid and binding as they or like assessments and acts would be if done under this act."

The validity of this act is denied.

First, it is contended that it violates section 52 of the Constitution of the State, which provides that no law shall embrace more than one object, which shall be expressed in its title. But in this view we cannot concur. It is true that it amends and re-enacts a law in relation to the assessments of lands and lots, and that it validates assessments made under the act which it amends and re-enacts; but this diversity does not vitiate the act.

The precise objection to this act is, that it embraces more than one object, in this, that it provides for the amendment of chapter 23 of the Code, in relation to the assessment of lands and lots, and also validates assessments made under that chapter as amended. We concede that if an act embraces two subjects the entire act must be declared void, although both are expressed in the title, as in this case; but we are of opinion that the subjects expressed both in the title and in the act are congruous, have natural connection with and are germane to one object, which is the assessment of lands of the State, and such being the case it is not repugnant to the constitutional provision.

As was said in *Iverson Brown's Case,* 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110, "Although the act or statute authorizes many things of a diverse nature to be done, the title will be sufficient if the things authorized may be fairly regarded as in furtherance of the object expressed in the title. It is, therefore, to be liberally construed and treated so as to uphold the law, if practicable. All that is required by the constitutional provision is that the subjects embraced in the statute, but not specified in the title, are congruous, and have natural connection with, or are germane to, the subject expressed in the title. This has been, so far as we are aware, the construction given this provision of the Constitution by this court, by the highest courts of other states, whose constitutions contain the same or a similar provision, and by the Supreme Court of the United States."

In *Ingles* v. *Straus,* 91 Va. 209, 21 S. E. 490, it is said, that if the subjects embraced by the act, but not specified in the title, have congruity or natural connection with the subject stated in the title, or are cognate or germane thereto, the requirement of the Constitution is satisfied.

*Prison Asso.* v. *Ashby,* 93 Va. 667, 25 S. E. 893; *Bossang* v. *Building Asso.,* 96 Va. 119, 30 S. E. 440; *Trehy* v. *Com'th,* 100 Va. 40, 40 S. E. 126.

The second objection to the act is, that it violates Article 14 of the Constitution of the United States, and section 11 of the State Constitution, both of which provide that no person shall be deprived of his property without due process of law.

There is no stronger presumption known to the law than that which is made by the courts with respect to the constitutionality of an act of Legislature.

As was said by Judge Staples, in *Town of Danville* v. *Pace,* 25 Gratt. 9, 18 Am. Rep. 663, "The Legislature represents the sovereign authority of the people, except so far as restrictions are enforced by the Constitution in express terms or by strong implication. We look to the Constitution of the State not for grants of power, but for limitations. When the prohibition is not found in the language of that instrument, or in its framework and general arrangement, there is no solid ground to pronounce the enactment void. The infraction must be clear and palpable." This conclusion follows from the accepted canon of construction applicable to the Constitution of this State, that it is a restraining instrument, and that the General Assembly of the State possesses all legislative power not prohibited by the Constitution. *Brown* v. *Epps,* 91 Va. 726, 21 S. E. 119, 27 L. R. A. 676.

In the language of Chief Justice Marshall, "the question whether a law be void for its repugnancy to the Constitution is

at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The opposition between the Constitution and the law should be such that the judge feels a strong and clear conviction of their incompatibility with each other. *Fletcher* v. *Peck,* 6 Cranch (U. S.) 87, 128, 3 L. Ed. 162.

"Let it be conceded," says Judge Staples, in *Town of Danville* v. *Pace, supra,* "that there are restrictions upon the legislative power not found expressly enumerated in the Constitution; that a law may not infringe upon any specific provision of that instrument, and yet it may involve so flagrant an abuse of power that it is the imperative duty of the judiciary to interpose and arrest its execution; still it must be also conceded that when we depart from the express limitations of the Constitution, and venture into the vast and unexplored region of implied restrictions, the legislative usurpation ought to be very clear, palpable, and oppressive to justify the interposition of the judiciary."

Courts do not look with favor upon retroactive and retrospective laws, and a statute is always to be construed as operating prospectively, unless a contrary intent is manifest. But it cannot be denied that the Legislature may, in its wisdom, pass retrospective statutes, sometimes called curative laws, subject to certain well-defined limitations upon its power. It cannot pass an *ex post facto* law, nor a law which impairs the obligation of a contract; and, since the adoption of the Fourteenth Amendment and the introduction into our Constitution of identical phraseology, it may be conceded that it cannot divest vested rights, because that would be to deprive a citizen of property without due process of law; but until that principle was introduced into the Constitution of the United States by the Fourteenth Amendment, the only limitation upon the power

of a State with respect to retrospective laws was, that they should not impair the obligation of contracts, nor partake of the nature of *ex post facto* laws:

The case of *Satterlee* v. *Matthewson*, 2 Pet. (U. S.) 380, 7 L. Ed. 458, is a striking illustration of the recognized power of States with respect to retroactive legislation. Satterlee and Matthewson held land in Pennsylvania, in common, under a Connecticut title. A division of the land was made between them, and Satterlee became a tenant of Matthewson of his part of the land, under a lease to be terminated on a notice of one year. Satterlee afterwards obtained a Pennsylvania title to the land leased to him by Matthewson, and on a trial in an ejectment for the land, brought by Matthewson against Satterlee, the Court of Common Pleas of Pennsylvania held that, S., having held the land as tenant of Matthewson, could not set up a title against his landlord. Upon a writ of error to the Supreme Court of Pennsylvania, it was held that "the relation between landlord and tenant could not exist between persons holding under a Connecticut title." The Legislature of Pennsylvania, on the 8th of April, 1826, passed an act declaring that "the relation of landlord and tenant should exist and be held as fully and effectually between Connecticut settlers and Pennsylvania claimants as between citizens of the Commonwealth." The case came again before the Supreme Court of Pennsylvania, and the judgment of the Court of Common Pleas, holding that the act of Assembly of the 8th of April, 1826, was a constitutional act, and did not impair the validity of any contract, was affirmed. S. brought a writ of error to the Supreme Court of the United States, claiming that the act was unconstitutional, and that court affirmed the judgment and held that the act was constitutional. Mr. Justice Washington, delivering the opinion of the court, said in part

as follows: "If the effect of the statute in question be not to impair the obligation of either of those contracts, and none other appears upon this record, is there any other part of the Constitution of the United States to which it is repugnant? It is said to be retrospective. Be it so; but retrospective laws which do not impair the obligation of contracts, or partake of the character of *ex post facto* laws, are not condemned or forbidden by any part of that instrument." See *Railroad Co.* v. *Nesbit*, 10 How. (U. S.), 395, 13 L. Ed. 469.

In *Randall* v. *Krieger*, 23 Wall. (U. S.) 137, 23 L. Ed. 124, the Legislature of Minnesota undertook to validate a deed for land made by a married woman, which, by reason of its ineffectual acknowledgment, was null and void, and it was insisted that the Legislature could not declare an act done by a married woman to be valid and binding, which, when done, she was absolutely without any capacity to do; but the court said, in answer to this contention, that there is nothing in the Consitution of the United States which prohibits the Legislature of a State from passing an act which divests rights vested by law, provided its effect be not to impair the obligation of a contract.

Among the cases cited in the opinion in that case is that of *Watson* v. *Mercer*, reported in 8 Pet. (U. S.) 110, 8 L. Ed. 876. The title to the premises in controversy in that case was originally in Margaret Mercer, the wife of James Mercer. For the purpose of transferring the title to her husband, they conveyed to a third person, who immediately conveyed to James Mercer, her husband. The deed of Mercer and wife bore date of the 30th of May, 1785. It was fatally defective as to the wife, in not having been acknowledged by her in conformity with the provision of the statute of Pennsylvania of 1770, touching the conveyance of real estate by *femes covert.* She died without issue. James Mercer died leaving children by a

former marriage. After the death of both parties, her heirs sued his heirs in ejectment for the premises and recovered. The Supreme Court of the State affirmed the judgment. In 1826 the Legislature passed an act which cured the defective acknowledgment of Margaret Mercer, and gave the same validity to the deed as if it had been well executed originally on her part. The heirs of James Mercer thereupon sued her heirs and recovered back the same premises. This judgment was also affirmed by the Supreme Court of the State, and the judgment of affirmance was affirmed by the Supreme Court of the United States.

It is not claimed that there is any inhibition in the Constitution of the State of Virginia upon the passage of retrospective laws by the Legislature. The authorities we have cited abundantly show that such laws are not repugnant to the Constitution of the United States, unless they partake of the nature of *ex post facto* laws, or impair the obligation of a contract; or, since the adoption of the Fourteenth Amendment, deprive a citizen of property without due process of law.

From these propositions a fourth qualification is deduced, which is really a corollary from them, and that is, that the curative act can only be effectual to do that which the Legislature would have been competent to provide for and require to be done by a law prospective in its operation.

There is one other act which we must consider before we come to a general discussion of the principles applicable to the curative act, the validity of which we are called upon to determine.

By an act approved December 10, 1903, chapter 401, Acts 1902-'3-'4, p. 626, which is entitled "An act vesting in the circuit courts of this Commonwealth, and in the judges thereof, the jurisdiction and powers now vested in and exercised by, and

duties imposed upon, the county courts, or the judges thereof, under the laws of this State, or under any will or other instrument of writing," it is provided that "the jurisdiction and powers now vested in and exercised by, and duties imposed upon, the county courts of this Commonwealth, and the judges thereof, under the laws of this State, or under any will or other instrument of writing, shall be vested in, exercised by, and imposed upon the circuit courts of this Commonwealth, and the judges thereof, except when otherwise specially provided"; and by an act approved February 9, 1904, chapter 14, Acts 1904, that act is amended in a manner not necessary to be here mentioned, and re-enacted.

By that act, we are of opinion that the circuit courts and the judges thereof were vested with the jurisdiction to appoint assessors, which had theretofore been vested in and exercised by the county courts and judges; and that upon the authority of the cases cited in discussing the assessment act, approved December 10, 1903, it is not repugnant to section 52 of the Constitution of the State.

It is contended, however, that as the act of December 10, 1903, was null and void, there was no such officer as that of assessor provided for by law, and that there can be no such thing as a *de facto* officer unless there is in existence a *de jure* office.

Let this be conceded. The act of December 10, 1903, being void, the chapter which it undertook to amend and re-enact remains in force as it stood prior to that date, and under it the county courts were required to appoint assessors. But by the act to which we have just referred, approved February 9, 1904, that duty devolved upon the circuit courts, by whom assessors were duly appointed. Those assessors qualified and entered upon the discharge of their duties. They were officers, not only

*de facto,* but *de jure.* These officers thus appointed proceeded in the execution of their duties under the act, or supposed act, of December 10, 1903, and in fact assessed all the lands of the State, and it is those assessments which the Legislature undertook to validate by the act of March 17, 1906.

Let us consider for a moment the facts as they existed when the act of March 17, 1906, was passed. There was, as we have seen, upon the statute books a law, published by authority, within the competency of the Legislature to pass, and accepted and acted upon as a valid and binding law. Under it all the lands of the State were assessed by officers duly appointed by competent authority and regularly inducted into office. Unknown to all, there was an infirmity in that act which rendered it null and void, because not passed in the manner prescribed by the Constitution. What was done under the act, however, remains. Whatever infirmity may have existed in the law which required the assessment to be made, the fact remains that the assessment was made in accordance with its terms. About that there can be no dispute, and, as a fact, it remains to be dealt with.

The Legislature, confronted with this situation, met it by the passage of the act of March 17, 1906, by which the act of December 10, 1903, was re-enacted in the mode prescribed by the Constitution; and the same act confirms and declares to be valid and binding all assessments made in compliance with the terms of the act of December 10, 1903.

Does that curative act violate the Constitution of the United States or of the State? It is not *ex post facto* in its nature; it does not impair the obligation of a contract; it divests no vested right. It is the duty of every citizen, in return for the protection he receives of his person and property, to bear his just proportion of the burden of taxation. That burden cannot be

distributed without an assessment of the property upon which
it is to be imposed.   That the Legislature had the authority and
was charged with the duty to pass a proper assessment law is
beyond dispute.   Every intendment and presumption which
can apply with respect to the constitutionality of an act of the
Legislature bears with full force upon the act under considera-
tion.   We have seen that it is not repugnant to the Constitution
of the United States, provided it meets the requirement of the
Fourteenth Amendment with respect to due process of law, and
the similar provision in the State Constitution, with respect to
which subjects we will deal later on.   We have seen that there
is no express inhibition in the State Constitution upon the pas-
sage of retrospective laws; and can it be said, in the language
of Judge Staples, in *Town of Danville* v. *Pace, supra,* that "it
involves so flagrant an abuse of power that it is the imperative
duty of the judiciary to interpose and arrest its execution"?
That admirable statement of the law is followed by the impres-
sive caution, that "when we depart from the express limitations
of the Constitution, and venture into the vast and unexplored
region of implied restrictions, the legislative usurpation ought
to be very clear, palpable and oppressive to justify the inter-
position of the judiciary."

We have endeavored to look into the underlying facts and
the principles of law which ought to apply to them, and we
have thus far been unable to discover any reason to denounce
the curative act as unconstitutional.   Let us now examine into
the authorities bearing upon the subject.

We have no case in our reports which throws any very help-
ful light upon the discussion.   *Griffin* v. *Cunningham,* 20 Gratt.
31, was cited and relied on by the counsel for appellants.   After
the war the Congress of the United States passed a series of
measures known as the "Reconstruction Laws," by virtue of

which the State passed under the control of a military gov-
ernor, who filled the various offices of the State with his ap-
pointees.   The judges of the Court of Appeals were among the
number, and when the State was restored to the Union they
continued to exercise the functions of their office.  By an act of
the General Assembly it was provided that any judgment, de-
cree or order rendered by the Court of Appeals at its term
commencing on the 20th day of January, 1870, "shall be sub-
ject to the supervision and control of the Supreme Court of Ap-
peals, to be organized under the Constitution, upon the motion
or petition of any party to the cause for a rehearing; and such
judgment, decree, or order may be set aside and annulled, or
affirmed, as to said Supreme Court may seem right and proper."
This court held, however, when the question was brought before
it, that that act was unconstitutional; that a case decided by
the Supreme Court of Appeals at one term of the court, at
which no motion is made to rehear it, cannot be reheard at a
subsequent term of the court; and these conclusions were
reached because the judges who had rendered the decisions
which the "Enabling Act" authorized the court to rehear were
*de facto* officers holding a *de jure* office, were acting *colore
officii,* and whose acts, while they remained in office, were as
valid and binding as though they had been legally appointed and
duly qualified.   The reconstruction acts were a flagrant viola-
tion of the Constitution, and the whole system which rested
upon them was an usurpation; but such was the vigor of the
principle which, upon grounds of public policy, imparts vitality
to the acts of a *de facto* officer who has been inducted into an
office, that they were in *Griffin* v. *Cunningham* held to be valid
and binding, although the act of the Legislature did not under-
take to cure the infirmity, but sought to give to the court au-
thority to uproot and to annul the judgment of a court so
organized.

As illustrating what the Legislature may not do by a retrospective law, we may cite *Hasbrouch* v. *Milwaukee,* 13 Wis. 37, 80 Am. Dec. 718, where it was held that the act of a municipal corporation could not be ratified so as to impose a burden upon the corporation without its assent, because such a law if prospective in its operation would have been equally in excess of the legislative power.

In *People* v. *Lynch,* 51 Cal. 15, 21 Am. Rep. 677, it is said that an assessment made upon lots in a city for the purpose of improving a street, may be apportioned by reference to the number of front feet of the lots, or any other standard which will approximate equality; yet, whatever standard is adopted, it must be levied with uniformity and equality; therefore, if, in levying such an assessment, a lot of land within the district declared to be benefited is not assessed, and the whole expense is assessed upon the remaining lots, the whole assessment is void. The Legislature has not the power to levy an assessment not uniform and equal, in an incorporated city, for the purpose of improving a street, nor can it, after an assessment has been made by the municipal authorities for such purpose, which is void for want of uniformity and equality, validate it.    Obviously not.    It cannot give retroactive force to a law which it was incapable of passing and giving prospective validity to. Yet it is of this case that Mr. Cooley remarks that it shows very clearly the limit of power in validating assessments. *Cooley,* 531, n.

In *Walpole* v. *Elliott,* 18 Ind. 259, 81 Am. Dec. 358, it is said that "curative laws are but a species of retrospective legislation; and retrospective legislation is valid where not forbidden by the Constitution"; and the court declared that it was competent for the Legislature, by a curative statute, where not re-

strained by a constitutional provision, to make a void thing valid.

In *Cowgill* v. *Long,* 15 Ill. 202, it appears that by an act of the Legislature of Illinois it was provided that "on the first Saturday of May next, and on the first Saturday of May annually thereafter, the inhabitants, legal voters of any school district in this State, may meet together at some convenient place in the district, for the purpose of voting for or against levying a tax for the support of common schools, for building and repairing school-houses, or for other school purposes." It was further provided that "if five of said inhabitants request it, the school directors shall call such meeting, to be holden upon any Saturday." The 72d section of the act required the district clerk to certify to the county clerk, before the first of July, a correct abstract of the votes, and the amount of money voted to be raised. On Saturday, the 20th day of July, the inhabitants of a school district voted $500 for the purpose of erecting a school-house, and Cowgill was charged with $28.26 on account of this tax. The collector distrained for its payment, and he thereupon filed his bill in chancery against the collector, and enjoined him from selling the property distrained. The court said : "The tax might properly have been voted on any Saturday in May or June. But the tax was improperly voted in July. It was then too late to have the same charged on the assessment for 1850. A school tax could not be included in the tax book of that year, unless it was reported to the county clerk before the first of July. This provision of the statute is imperative, and in no sense discretionary. It is as essential to the validity of a school tax that it be certified to the county clerk by the day designated as it is to the validity of a State and county tax that the assessment be made and returned within the time limited. If this was the only point in the case, the complain-

ants would clearly be entitled to the relief sought, or if the property seized had been sold, their title would not be divested by the proceedings." In other words, the court up to that point held that the election was void and the tax imposed was illegal. But on the 21st of January, 1853, the Legislature passed an act relating exclusively to this particular tax, with respect to which the court says: "The intention of the Legislature cannot be mistaken. It was to cure the defects in voting and charging the tax. And the object was accomplished, if the Legislature had power to pass the act. So far as this case is concerned, there can be no reasonable doubt of its authority in the matter." And the law was upheld, though it clearly gave validity to that which was, in the absence of the curative statute, an utter nullity. See also *Rogers* v. *Keokuk,* 3 Wall. (U. S.), 18 L. Ed. 74; *Thompson* v. *Lee Co.,* 3 Wall. (U. S.) 327, 18 L. Ed. 177.

In *Boardman* v. *Beckwith,* 18 Iowa 292, the facts were as follows: On the 22d of March, 1858, a general act was passed relating to revenue, which repealed all prior acts in conflict therewith. By this act, however, no provision was made for the levy and assessment of taxes for 1858. At the next session of the General Assembly an act was passed, "to enforce the collection of delinquent taxes for the year 1858," which, in the preamble, refers to the prior legislation and the omission, and recites that taxes were assessed and levied in pursuance of the laws in force prior to 1858, and that many persons had refused to pay the same. Then follows an enactment legalizing such levies and assessments with like effect as if chapter 152 had not been enacted, and also declaring it to be lawful for, and the duty of, the several collectors to proceed in the collection of all taxes thus legalized, as in other cases of like delinquent taxes assessed pursuant to law. And by the last section it is

declared that the title to all property sold in the collection of delinquent taxes in said act legalized shall vest in the purchaser with like effect as if said taxes had been legally assessed, and said sales had taken place in pursuance of law. In that case, it will be observed, that all prior acts were repealed by the act of the 22d of March, 1858, which went into effect July 4, 1856, but this act made no provision for the levy or assessment of taxes for the year 1858, so that there was no law whatever, constitutional or unconstitutional, authorizing such assessment and levy. The court in that case said: "The point made upon this legislation is, that it was not competent for the General Assembly to thus legalize the levy and assessment of 1858; that as there was no law at the time authorizing such levy and assessment, all proceedings thereunder, notwithstanding the curative act, were illegal and void. Whatever doubt there might be, if the act of 1860 had taken effect after the sale and purchase under which plaintiff claims, there can be no room for controversy when it is remembered that it was passed and took effect long prior to that time. That it is competent to thus legislate we entertain no doubt. The power of the Legislature to pass acts of this character, conducive as they are to the general welfare, and based upon considerations of controlling public necessity, is, in our opinion, undoubted. It does not interfere with vested rights, nor impair the obligation of any contract. Nor is it, we may remark in further answer to appellants' argument, a general statute, having other or less than a uniform operation."

In *State* v. *Squires,* 26 Iowa 340, it is held that retrospective laws, as distinguished from *ex post facto* laws, are not in conflict with the Constitution of the United States; and that, in the absence of any constitutional inhibition, the Legislature has the power to pass retrospective or retroactive laws, and they will

not be declared inoperative except when they disturb or inter-
fere with vested rights; that as a requisite to the rightful exer-
cise of the legislative power to cure a defective proceeding, it
must have possessed the power to authorize the same result by
prior legislation, though it is not necessary that it might have
accomplished the result in the precise manner it has adopted
to cure the defect.    In the course of the opinion the court said:
"Nor is the power of the Legislature to cure defective or irregu-
lar proceedings limited by the fact that, but for such curative
act, the defective proceeding would be wholly invalid or in-
operative."    And further it declared, that "it cannot be claimed
that the act in controversy divests or interferes with vested
rights, or that it contravenes sound public policy.    But, on the
contrary, it is reasonable, and conducive to the public good in
quieting litigation and otherwise, and as it does not conflict with
the Constitution or violate any principle of justice, it should
be upheld."

In *Iowa Railroad Land Co.* v. *Soper,* 39 Iowa 112, the sylla-
bus says: "In the absence of any constitutional inhibition, the
Legislature has the power to pass retrospective or retroactive
laws, and they will be declared inoperative only when they
interfere with vested rights.    Such laws, as distinguished from
*ex post facto* laws, are not unconstitutional.    Taxes levied with-
out authority of law may be rendered legal and valid by sub-
sequent legislative enactment.    Since the Legislature has the
power to pass a general law for the levy and collection of special
taxes, for the purpose of paying judgments, without limitation
as to rate, it may rightfully legalize levies in excess of lawful
authority at the time they are made.    A legislative act which
legalizes a tax before invalid and uncollectible, does not impair
any vested right of the tax-payer.    The distinction between leg-
islation which attempts to cure the acts of officers void for in-

formality or mistake, and that which seeks to legalize official acts void for want of authority, is not recognized in this State."

.Referring to *Boardman* v. *Beckwith, supra,* the opinion says: "This act" (in that case), "although it was retrospective and legalized taxes which were levied without any shadow of legal authority, and the levies were therefore utterly void, was held constitutional and operative."

In further discussion of the subject the court said: "There can be no doubt that the General Assembly had the power, and might have enacted a law under which the various municipal corporations in the State would have been authorized to levy and collect the taxes in question. In other words, the authority to levy and collect taxes to pay judgments against municipal corporations could have been conferred by a general law without any limitation therein as to the rate, so that the taxes, legalized by the act under consideration, would have been authorized and valid. Having the power to authorize, by general law, the levy and collection of special taxes, by municipal corporations, without limitation as to rate, for the purpose of paying judgments, the Legislature may rightfully legalize or cure the levies made in excess of lawful authority at the time. When it is conceded that the General Assembly has the power to pass an act conferring authority upon municipal corporations to levy taxes, it necessarily follows that the same power may cure or ratify and make valid the taxes levied without such prior authority, unless vested rights are thereby impaired."

But it is claimed that this curative act is invalid because it takes property without due process of law, in that it did not afford an opportunity of appearing and contesting before any court the validity and justice of the assessment. In support of this contention an act approved March 15, 1904, is cited, which amends section 444 of the Code, which corresponds with section

444 of the act passed December 10, 1903. By the terms of the act of March 15, 1904, any person feeling himself aggrieved might "apply to the circuit court of the county or corporation court of the corporation in which the land lies, at any time prior to the first day of February of the second year after such assessment, and not after, to have the assessment of his lands and lots corrected." By the curative act passed March 17, 1906, this section was amended and re-enacted so as to provide that any person feeling himself so aggrieved might apply before the first day of February of the year next succeeding such assessment, and not after, to have the assessment of his lands or lots corrected.

The assessment which is the subject of controversy in these proceedings having been made in 1905, and the curative act having been passed in March, 1906, there was, of course, by the terms of the curative act, no possible time within which a person feeling aggrieved could have applied for relief. To give to this feature of the law a retrospective operation would, therefore, lead to a manifest absurdity, and such a construction will not be adopted by the courts.

But there is no occasion to give it any such construction. The law of March 17, 1906, is prospective as well as retrospective in its operation, and as to any future assessment it remains upon the statute books unchanged, and the person who deems himself aggrieved must apply for relief according to its terms at some time prior to February 1st of the year next succeeding the assessment. But that has no application to assessments actually made prior to the passage of the act.

It is also true that where a statute can be construed as in harmony with the fundamental law, the courts will adopt that construction rather than one which will render the law void. Now by the act of March 17, 1906, the Legislature, as we have

seen, by a curative law, operating retrospectively, confirmed the assessments actually made under a void law. That curative act is valid if it affords those deeming themselves aggrieved by the assessment an opportunity to apply to the courts for relief. By an act approved March 15, 1904, section 444 of the Code, with respect to the correction of erroneous assessments of lands, was amended and re-enacted so as to read as follows: "Any person feeling himself aggrieved by the assessments of his lands or lots may, upon giving notice to the assessor and to the attorney for the Commonwealth, apply to the circuit court of the county or corporation court of the corporation, in which the land lies, at any time prior to the first day of February of the second year after such assessment, and not after, to have the assessment of his lands and lots corrected, which notice shall be in writing, and shall have appended thereto an affidavit of the owner, or his duly authorized agent, that in the opinion of the affiant the assessment of his lands or lots is above the true value thereof. The attorney for the Commonwealth shall defend the application, and if the court shall be satisfied that the assessment is too high, it shall reduce the same to what, in its opinion, is the true value of such lands or lots; but if it shall be of opinion that the assessment is too low, then it shall increase it in like manner; and such application shall have precedence over all other causes pending in said court, but no cost shall be taxed against the applicant or the Commonwealth."

The assessment of lands and imposition of taxes is a taking within the meaning of the Constitution of the United States, and the law, under which property is assessed, must provide an opportunity for the owner to be heard and contest the justice of the assessment; otherwise he is deprived of his property without due process of law, and the law is unconstitutional and void. *Heth* v. *Radford,* 96 Va. 272, 31 S. E. 8.

If, therefore, section 444, as passed March 17, 1906, be held to be retrospective, it would deprive the persons assessed of all remedy, and would be unconstitutional and void. By preserving to the citizen the remedy prescribed by section 444, as to acts under the act of December 10, 1903, done prior to the act of March 17, 1906, the curative act is valid in all its parts. The rules which require an act to be construed so as, if possible, to give it a sensible operation, and which adopt that construction which renders the law conformable to the Constitution, are, we think, sufficient to preserve as to past transactions the remedy given by section 444 as it stood on the day before the passage of the curative act.

But if there be an doubt upon the subject, section 6 of the Code would put it at rest. That section is as follows:

"No new law shall be construed to repeal a former law as to any offense committed against the former law, or as to any act done, any penalty, forfeiture, or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture, or punishment so incurred, or any right accrued, or claim arising before the new law takes effect. . . ."

Any other construction would defeat the purpose of the Legislature, and as the conclusion can be reached in accordance with established rules of construction, we are of opinion that the remedy remained as to past transactions as it existed on the day before the passage of the act of March 17, 1906, and any person aggrieved by assessments made before that day may apply to the courts for relief at any time prior to the 1st day of February of the second year after such assessments were made.

That a provision in a statute "for notice to and hearing of each proprietor, at some stage of the proceedings, upon the

question, what proportion of the tax shall be assessed upon his land," fulfills all the essentials of due process of law, is established by *McMillen* v. *Anderson,* 95 U. S. 37, 24 L. Ed. 335; *Davidson* v. *New Orleans,* 96 U. S. 97, 24 L. Ed. 616, and *Paulsen* v. *City of Portland,* 149 U. S. 30, 13 Sup. Ct. 750, 37 L. Ed. 637.

There remains one question to be disposed of, which arises in respect to the assessment in the city of Richmond. It is claimed that it is invalid because there was no return made of such assessment within the time prescribed by law; but we cannot agree to the correctness of this position, the effect of which would be to render all assessments of lands of the Commonwealth void if the assessors failed to return their assessments until after the date fixed by law for their delivery.

Time is not, in this case, of the essence of the transaction, nor is it anywhere in the act made a condition of its validity. The assessments should be returned in time to give all persons affected by them opportunity to make objection and obtain redress; but when this has been done we think that every necessary condition has been satisfied and that the provision relied upon is directory and not mandatory in its operation.

To recapitulate the positions discussed, and, as we hope, established by what we have said, it appears that on December 10, 1903, the Legislature undertook to pass an act, as it was required by the Constitution to do, providing for the assessment of lands and lots in this State; that the act was published by authority among the statutes enacted at that session of the General Assembly; that under it assessors were appointed by the circuit and corporation courts, who qualified and actually assessed the lands of the State in accordance with the terms of that statute; that in the progress of events an infirmity was discovered in the method in which that act was passed, which

rendered it null and void; that, being void, the law was in force as it existed on and before the 10th of December, 1903; that the law then existing provided for the appointment of assessors by the county courts; that by an act also passed December 10, 1903, and amended by an act approved February 9, 1904, the jurisdiction to appoint assessors, theretofore existing in the county courts, was vested in the circuit courts of the State; that by virtue of this appointment assessments were in point of fact made, and made in accordance with the terms of the act of December 10, 1903, the assessors assuming, of course, that the act of December 10, 1903, was the law by which they were to be guided and controlled; that the infirmity in that law having been discovered, the Legislature re-enacted the law and in the same act declared that all assessments and all other acts of every kind made or done in compliance with the terms of chapter 388 of the Acts of Assembly of 1902-'3-'4, approved December 10, 1903, "are hereby confirmed and declared to be as valid and binding as they or like assessments and acts would be if done under this act"; that section 444 of the curative act is to be construed prospectively, and as applicable only to future assessments, because to give to it a retrospective operation would not only involve an absurdity, but would render the very thing which the Legislature undertook to do unconstitutional and void and, therefore, that construction is adopted which gives the act a rational and sensible effect, and, by preserving to past transactions the remedy existing at the time those acts were done, relieves the curative act of the taint of unconstitutionality which would attach to it if no provision were made to enable persons aggrieved by the assessment to resort to the courts for relief.

For these reasons we have reached the conclusion that the curative act is a valid and constitutional exercise of legislative

authority, and operates to validate the assessments made under the act of December 10, 1903.

In the consideration of the many novel and difficult questions presented in this record, we have been greatly aided by the researches of counsel, and by the able and instructive opinion of the judge of the Law and Equity Court of the city of Richmond.

We are of opinion that the decree of the Law and Equity Court in *Whitlock and others* v. *Hawkins, Commissioner, &c.,* and the judgment of the Hustings Court of the city of Richmond in *O'Flaherty, Substituted Trustee, &c.,* v. *Commonwealth,* should be affirmed, and that in the case of *Cannon and others* v. *Hawkins, Commissioner, &c.,* the petition to this court for mandamus should be refused.

*Affirmed in two cases.*

*Mandamus denied in third case.*